Lawrence M. Rolnick
Marc B. Kramer
Michael J. Hampson
Richard A. Bodnar
ROLNICK KRAMER SADIGHI LLP
1251 Avenue of the Americas
New York, New York 10020
Tel.: (212) 597-2800
lrolnick@rksllp.com
mkramer@rksllp.com
mhampson@rksllp.com
rbodnar@rksllp.com

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

------------------------------------------------------------------x
:
PALOMINO MASTER LTD., AZTECA : Civil Case No.: _____
PARTNERS LLC, and APPALOOSA LP :
:
Plaintiffs, :
:
v. : **JURY TRIAL DEMANDED**
:
CREDIT SUISSE GROUP AG, AXEL P. :
LEHMANN, and ULRICH KÖRNER, :
:
Defendants. :
:
------------------------------------------------------------------x

**<u>COMPLAINT AND DEMAND FOR JURY TRIAL</u>**

**TABLE OF CONTENTS**

**Page**

NATURE OF THE ACTION ................................................................................... 1

JURISDICTION AND VENUE ............................................................................... 6

PARTIES ................................................................................................................ 7

    I.   Plaintiffs ...................................................................................................... 7

    II.  Defendants ................................................................................................... 7

Factual Allegations ............................................................................................... 8

    I.   Credit Suisse's Liquidity and Capital Requirements ................................... 8

    II.  Credit Suisse's AT1 Notes ......................................................................... 10

    III.  Credit Suisse Appears to Weather a Liquidity Crisis in Late 2022 .............. 12

    IV.  The Collapse of SVB Reignites Concerns with Respect to Credit Suisse ..... 14

    V.   Credit Suisse's CEO Assures the Market That the Bank's Financial Condition Is "Very Strong".................................................................................................... 15

    VI.  Credit Suisse's Creditor Presentation........................................................... 16

    VII. Plaintiffs Purchase Credit Suisse's AT1 Notes ........................................... 19

    VIII.  Credit Suisse's Chairman Assures the Market that Allowing Government Assistance "*Is Not a Topic*"........................................................................................... 19

    IX.  Credit Suisse's Largest Shareholder Casts Doubt over the Bank's Liquidity, but Defendants Deny That the Bank Is in Trouble ............................................... 20

    X.   Credit Suisse Accepts Government Assistance ............................................. 21

    XI.  Swiss Authorities Orchestrate an Emergency Takeover of Credit Suisse by UBS, Wiping Out the AT1 Notes ........................................................................................ 23

    XII. Defendants Change Their Story .................................................................. 26

    XIII.  Swiss Prosecutors Investigate the Legality of the Forced Takeover............ 27

    XIV.  FINMA Issues Its Report About the Collapse of Credit Suisse .................. 28

DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS ............... 30

    I.   Körner's Misrepresentations on March 14, 2023 ......................................... 30

    II.  Misrepresentations in Credit Suisse's March 14, 2023 Fixed Income Presentation ....... 31

    III.  Lehmann's Misrepresentations on March 15, 2023 ..................................... 31

    IV.  Körner's Misrepresentations on March 15, 2023 ........................................ 32

ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ......................................... 33

PRESUMPTION OF RELIANCE ..................................................................................... 38

PLAINTIFFS' ACTUAL RELIANCE .................................................................................. 39

LOSS CAUSATION ......................................................................................................... 40

NO SAFE HARBOR ........................................................................................................ 44

NEW JERSEY RICO ....................................................................................................... 45

FIRST CAUSE OF ACTION ............................................................................................ 49

SECOND CAUSE OF ACTION ....................................................................................... 52

THIRD CAUSE OF ACTION ........................................................................................... 53

FOURTH CAUSE OF ACTION ........................................................................................ 55

FIFTH CAUSE OF ACTION ............................................................................................ 57

PRAYER FOR RELIEF ................................................................................................... 57

JURY DEMAND ............................................................................................................. 58

Plaintiffs Palomino Master Ltd., Azteca Partners LLC, and Appaloosa LP (collectively, "Plaintiffs") are purchasers of Additional Tier One notes ("AT1 Notes") that were issued by Credit Suisse Group AG ("Credit Suisse," "CS," or the "Company").   Plaintiffs, through their undersigned attorneys, by way of this Complaint and Jury Demand, for their federal securities claims and New Jersey Racketeer Influenced and Corrupt Organizations Act ("New Jersey RICO") claim against Credit Suisse, its former Chairman of the Board Axel P. Lehmann ("Lehmann"), and its current Chief Executive Officer Ulrich Körner ("Körner," and, collectively with Credit Suisse and Lehmann, the "Defendants"), allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.

Plaintiffs' information and belief is based on, *inter alia*, an investigation by their attorneys, which investigation includes, among other things, a review and analysis of:  Credit Suisse's public filings with the United States Securities and Exchange Commission ("SEC"); Defendants' public statements to the financial media and through social media; media reports concerning Credit Suisse; analyst reports concerning Credit Suisse; and transcripts of conferences involving Defendants.  Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their custody and/or control.  Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is an action to recover significant investment losses suffered by investors who were misled by Defendants' misrepresentations concerning the financial health of a major international bank – Credit Suisse – during a fateful week in March 2023 when that bank faced serious liquidity issues.  Defendants falsely represented that Credit Suisse was experiencing material inflows of liquidity when the opposite was true.  They materially misrepresented Credit

Suisse's liquidity position as very strong and "getting stronger" at a time when there was a run on the bank and Credit Suisse was losing billions of dollars in withdrawals on a daily basis.

2.      Just before the fateful week, on March 10, 2023, another bank – Silicon Valley Bank ("SVB") – collapsed, representing the largest bank failure since the 2008 financial crisis. SVB's collapse was triggered in large part by a so-called "run on the bank" – significant withdrawals of cash deposits by SVB customers.

3.      The collapse of SVB created panic in the financial markets, including with respect to Credit Suisse, a venerable Swiss banking institution.  Switzerland has made banking one of the pillars of its economy by implementing bank secrecy laws and agreeing to protect assets deposited in Swiss accounts while remaining neutral in international conflicts.

4.      Credit Suisse had faced a liquidity crisis just a few months prior, in October 2022, which it told investors it had weathered.  At the time of that liquidity crisis, Credit Suisse's new Chairman of the Board – Defendant Lehmann – and its new Chief Executive Officer ("CEO") – Defendant Körner – vowed to implement a restructuring of the bank that would strengthen and improve its liquidity.

5.      Although Lehmann and Körner told investors that Credit Suisse had turned a corner in early 2023, in actuality the bank was in an extremely vulnerable position when SVB collapsed in March 2023.

6.      Given Credit Suisse's vulnerable liquidity position at that time, it wanted to avoid a bank run.  A bank run on Credit Suisse could have led to a liquidity crisis, a bailout, or other actions that would likely result in Körner and Lehmann having to leave their lucrative positions.

7.      The only way for Körner and Lehmann to prevent this from happening was to convince Credit Suisse's customers *not* to withdraw their money – in effect, to convince them that

other depositors were not withdrawing their money.  To do this, they had to mislead the market about their loss of deposits and about the weakened liquidity position that Credit Suisse was in.  If their lies were believed, the situation might stabilize and Credit Suisse would continue to exist with Körner and Lehmann still at the helm, having seemingly weathered a second liquidity crisis.

8.      To effectuate this plan, on March 14, 2023, Defendant Körner appeared on Bloomberg Television, where he was asked about Credit Suisse's position in the wake of SVB. Körner falsely stated that SVB had not impacted Credit Suisse and that the bank had received material *inflows* on March 13.  That is, Körner told the market that increases in the bank's deposits on March 13 exceeded its withdrawals.

9.      That was not true.  In reality, on March 13, 2023, Credit Suisse had experienced material *outflows* of CHF 1.6 billion.[1]  That is, *withdrawals* exceeded deposits by CHF 1.6 billion. Indeed, according to reports, Credit Suisse has admitted privately that Körner's statement was false.

10.      During that same interview, Körner also represented that Credit Suisse's "liquidity coverage ratio" was "strong, very strong" and "*getting stronger as we speak*."  However, that was not true either, as Credit Suisse's withdrawals were larger than its deposits.

11.      On March 15, 2023, Defendant Lehmann was interviewed by Bloomberg at the Financial Sector Conference in Riyadh, Saudi Arabia, where he added to the false narrative that Körner had started the prior day.  Lehmann suggested that any problems similar to those that were experienced by SVB had already been addressed by Credit Suisse.  He told viewers that Credit Suisse had already "taken its medicine," had been "significantly de-risking its balance sheet" for more than five months, and was ahead of the curve in dealing with potential liquidity issues.

---

[1] In March 2023, one Swiss Franc (CHF 1) was equal to between $1.06 and $1.10.

12.     In response to a question about whether Credit Suisse would allow or accept any kind of government assistance, Lehmann falsely asserted that it "was not a topic whatsoever." However, the next day, Credit Suisse announced its intent to accept CHF $50 billion from the reserve bank of Switzerland, Switzerland National Bank.

13.     Another attendee at the Financial Sector Conference in Riyadh on March 15 was the Chairman of the Saudi National Bank, Ammar Al Khudairy.  Shortly after Lehmann spoke, Al Khudairy was interviewed by a Bloomberg reporter in the hallway of the conference.  In response to a question about whether the Saudi National Bank – which had provided a large capital infusion to Credit Suisse in October 2022 – would increase its investment in Credit Suisse, Al Khudairy replied emphatically:   "The answer is absolutely not, for many reasons."   That statement heightened investor concern over whether Credit Suisse would experience liquidity issues.

14.     Later that evening, during an interview with CNA's Asia Tonight, Körner was asked how Credit Suisse was "going to stop the bleeding" caused by Al Khudairy's statement. Rather than concede that Credit Suisse was experiencing a liquidity crisis, Körner painted a rosy picture of Credit Suisse's liquidity position.

15.     First, Körner reiterated his comments from the previous day that Credit Suisse was subject to higher liquidity requirements than other smaller banks, which meant that its position was "not comparable" to SVB's.  He then assured the market that Credit Suisse was not having liquidity issues, stating that "we fulfill, and overshoot basically, all regulatory requirements.  Our capital, our liquidity basis, is very, very strong."

16.     But the fact of the matter was that Credit Suisse's liquidity position was extremely tenuous and its situation was not materially different from SVB's.  Like SVB, Credit Suisse was experiencing material depositor outflows.

17.     On Thursday, March 16, 2023, before Swiss markets opened, Credit Suisse issued a press release disclosing that it intended to exercise an option to borrow up to CHF 50 billion from the Swiss National Bank.

18.     Thus, just a few hours after Körner had told CNA that Credit Suisse's liquidity was "very, very strong," and not more than a day after Lehmann publicly stated that Credit Suisse would not allow any kind of government assistance (it was "not a topic whatsoever"), the bank accepted an emergency backstop from the Swiss government, becoming the first major global bank to tap an emergency lifeline since the 2008 financial crisis.

19.     Just three days later, on Sunday, March 19, 2023, FINMA announced a "merger" of UBS and Credit Suisse.  UBS agreed to pay CHF 3 billion to Credit Suisse shareholders in UBS stock as part of the deal.  The Swiss government agreed to backstop UBS for CHF 9 billion in losses that it might suffer by taking over Credit Suisse.  The Swiss National Bank also agreed to provide another CHF 200 billion in liquidity.

20.     In its press release announcing the deal, FINMA asserted that Credit Suisse had experienced "considerable outflows of client funds," which "intensified" following the US bank collapses in March, and that the bank was at risk of becoming illiquid:

> The Credit Suisse Group is experiencing a crisis of confidence, which has manifested in considerable outflows of client funds.  This was intensified by the upheavals in the US banking market in March 2023.  There was a risk of the bank becoming illiquid, even if it remained solvent, and it was necessary for the authorities to take action in order to prevent serious damage to the Swiss and international financial markets.

21.     As part of the transaction, the AT1 Notes that Plaintiffs had purchased during that final week ***were written to zero***.  FINMA subsequently disclosed that because the merger was negotiated under "high pressure" circumstances, writing off the AT1 Notes (so that UBS did not have to pay them) was a "necessary part of the overall package."

22.     On March 23, 2023, in response to significant backlash from blindsided AT1 Noteholders (who had been lied to for a week by Defendants), FINMA issued a press release providing the purported basis for the write-down.  First, FINMA stated that there was a contractual basis for the write-down due to the occurrence of a viability event triggered by "extraordinary government support [being] granted."   Second, FINMA stated that an emergency ordinance it passed on March 19 expressly authorized the ultimate write-down of the AT1 capital instruments.

23.     Defendants have since publicly admitted that they knew Credit Suisse was suffering serious liquidity issues at the beginning of the week of March 13, 2023, and that their statements to investors during that week were false.  FINMA has also issued a report documenting the numerous systemic and management issues that led to the downfall of Credit Suisse.

24.     Plaintiffs purchased Credit Suisse AT1 Notes between March 14 and March 19, 2023, during the time when, unbeknownst to Plaintiffs, Defendants were lying to the market about Credit Suisse's deteriorating liquidity.

25.     Plaintiffs bring this action under the federal securities laws and under New Jersey RICO to recover damages for the losses they suffered as a result of Defendants' materially false and misleading misstatements and misconduct.

## JURISDICTION AND VENUE

26.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and under New Jersey RICO, N.J.S.A. § 2C:41-1, *et seq*.

27.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, and has supplemental jurisdiction over the New Jersey RICO claim pursuant to 28 U.S.C. § 1367.

28.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391 as the alleged misstatements entered and the subsequent damages took place in this Judicial District.   At all relevant times, Credit Suisse conducted business in New Jersey and Plaintiffs purchased Credit Suisse AT1 Notes in New Jersey.

29.     In connection with the acts, transactions and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of a national securities market.

## PARTIES

### I.     Plaintiffs

30.     Plaintiff Palomino Master Ltd. ("Palomino") is a British Virgin Islands company limited by shares whose investment adviser has its main office location in Short Hills, New Jersey. A list of the dates on which it purchased Credit Suisse AT1 Notes in the United States during the relevant period is attached hereto as Exhibit A.

31.     Plaintiff Azteca Partners LLC ("Azteca") is a Delaware limited liability company whose investment adviser has its main office location in Short Hills, New Jersey.  A list of the dates on which it purchased Credit Suisse AT1 Notes in the United States during the relevant period is attached hereto as Exhibit B.

32.     Plaintiff Appaloosa LP ("Appaloosa") is a Delaware limited partnership that has its main office location in Short Hills, New Jersey.   Appaloosa acted as investment adviser to Palomino and Azteca in connection with their purchases of Credit Suisse AT1 Notes.

### II.    Defendants

33.     Defendant Credit Suisse is a Swiss bank with its headquarters in Zurich, Switzerland.  Up until its acquisition by UBS in 2023, Credit Suisse was one of only two Swiss

large institutional banks (the other being UBS).  As of the end of 2022, Credit Suisse held over half a trillion Swiss Francs in assets and had over 50,000 employees.  As part of its capital requirements, Credit Suisse was required to maintain a certain level of "additional tier 1 capital," which it did by selling AT1 Notes.  Through its senior executives, Credit Suisse made the materially false and misleading statements alleged herein.

34.     Defendant Lehmann is the former Chairman of Credit Suisse's Board of Directors. He was elected to the Credit Suisse Board of Directors in October 2021, where he served as Chair of the Risk Committee, and was elevated to Chairman of the Board in January 2022.  Prior to joining Credit Suisse, Lehmann worked for UBS for many years.  Among other high-ranking roles at UBS, Lehmann served as Chief Operating Officer and President of UBS Switzerland.  Prior to UBS, Lehmann worked as an executive at Zurich Insurance Group.  Lehmann made the materially false and misleading statements that are attributed to him herein.  As the Chairman of the Board of Credit Suisse, Lehmann had the power and authority to control the content of Credit Suisse's public statements to the markets.

35.     Defendant Körner joined Credit Suisse as head of its asset management business in 2021.  In July 2022, he was promoted to CEO of the bank.  Prior to Credit Suisse, Körner, like Lehmann, spent many years as an executive at UBS.  Körner made the materially false and misleading statements that are attributed to him herein.  As the CEO of Credit Suisse, Körner had the power and authority to control the content of Credit Suisse's public statements to the markets.

## FACTUAL ALLEGATIONS

## I.     Credit Suisse's Liquidity and Capital Requirements

36.     During the relevant time period, Credit Suisse was a Swiss banking group comprised of a wealth management division, a Swiss private bank, an asset management division, an investment bank, and a capital release unit.

37.     As a large Swiss bank, Credit Suisse was subject to liquidity and capital requirements imposed under the "Basel framework" as well as under Swiss law.

38.     Credit Suisse told the market that its approach to liquidity was a conservative one, designed to absorb any unforeseen challenges faced by the bank.  In its 2022 annual report issued on March 14, 2023 ("2022 Annual Report"), which was signed by Defendant Körner, Credit Suisse stated:

> ***Our liquidity and funding policy is designed to ensure that funding is available to meet all obligations in times of stress, whether caused by market events or issues specific to Credit Suisse***.  To address short-term liquidity stress, ***we maintain a liquidity pool***, as described below, ***that covers unexpected outflows in the event of severe market and idiosyncratic stress***.  Our liquidity risk parameters reflect various liquidity stress assumptions.  ***We manage our liquidity profile at a sufficient level such that, in the event we are unable to access unsecured funding, we expect to have sufficient liquidity to sustain operations for a period of time in excess of our minimum limit***. [2]

39.     Credit Suisse was subject to a liquidity coverage ratio (or "LCR").  This liquidity test purported to determine whether the bank's high-quality liquid assets were sufficient to meet its (projected) total net cash outflows over a 30-day period.

40.     With respect to its capital requirements, the Basel framework required Credit Suisse to maintain, among other things, a minimum common equity tier 1 ("CET1") of capital in an amount sufficient to meet a stated percentage of its risk-weighted assets (the "CET1 ratio"), as well as additional tier 1 ("AT1") capital.

41.     Swiss law imposed capital requirements on Credit Suisse beyond those under the Basel framework, requiring the bank to hold sufficient capital to absorb losses to ensure continuity of service (known as the "going concern requirement") and to issue sufficient debt instruments to

---

[2] Unless otherwise noted, bold italic emphasis in quotations has been added.

fund an orderly resolution without recourse to public resources (known as the "gone concern requirement").

42.     In its 2022 Annual Report, Credit Suisse graphically illustrated the different capital requirements imposed by the Basel framework and Swiss law:



## II.   <u>Credit Suisse's AT1 Notes</u>

43.     To generate AT1 capital, Credit Suisse issued AT1 Notes.

44.     AT1 Notes were a key component for Credit Suisse to maintain its capital structure.

45.     The idea behind AT1 capital instruments arose out of the 2008 financial crisis. Faced with both low capital levels and low share prices, European banks looked for a new way to increase liquidity.

46.     The solution was to issue AT1 capital instruments, which function like notes in that they pay interest and return principal when redeemed by the banks, but are also subject to contingent features that may make them more akin to equity in times of distress.

47.     Credit Suisse's AT1 Notes had a write-down feature pursuant to which the full principal amount of the notes could be permanently written down to zero, and the notes cancelled, upon the occurrence of certain specified triggering events.

48.     There were two categories of triggering events for Credit Suisse's AT1 Notes:  (1) a "Contingency Event"; and (2) a "Viability Event."

49.     A Contingency Event was triggered if Credit Suisse's CET1 ratio fell below a certain threshold.

50.     A Viability Event was triggered if certain conditions occurred at a time when Credit Suisse was facing insolvency, bankruptcy, or was otherwise unable to carry on as a going-concern.

51.     The prospectus issued by Credit Suisse in connection with the sale of AT1 Notes described two ways in which a Viability Event could occur.

52.     Firstly:

> *[FINMA] has notified [Credit Suisse] that it has determined that a write-down of the [AT1] Notes*, together with the conversion or write-down/off of holders' claims in respect of any and all other Going Concern Capital Instruments, Tier 1 Instruments and Tier 2 Instruments that, pursuant to their terms or by operation of law, are capable of being converted into equity or written down/off at that time, *is*, because customary measures to improve [Credit Suisse]'s capital adequacy are at the time inadequate or unfeasible, *an essential requirement to prevent [Credit Suisse] from becoming insolvent, bankrupt or unable to pay a material part of its debts as they fall due, or from ceasing to carry on its business*.

53.     Or, secondly:

> [C]ustomary measures to improve [Credit Suisse]'s capital adequacy being at the time inadequate or unfeasible, *[Credit Suisse] has received an irrevocable commitment of extraordinary support*

*from the [the Swiss government or the Swiss National Bank]* (beyond customary transactions and arrangements in the ordinary course) *that has, or imminently will have, the effect of improving [Credit Suisse]'s capital adequacy and without which, in the determination of the [FINMA], [Credit Suisse] would have become insolvent, bankrupt, unable to pay a material part of its debts as they fall due or unable to carry on its business.*

54.     Without AT1 financing, Credit Suisse could not comply with regulatory requirements.

55.     Credit Suisse's AT1 Notes did not have a maturity date – rather, Credit Suisse would call the notes (i.e., repay them) as soon as contractually permitted (typically after five years). Although not required to call the notes, prior to March 2023, Credit Suisse always had called its outstanding AT1 Notes and issued new AT1 Notes at the earliest possible redemption date.

56.     Likewise, until March 2023 Credit Suisse always had made the interest payments on the AT1 Notes. Credit Suisse did so even during years when it cut its shareholder dividend.

57.     Thus, to U.S. investors, Credit Suisse's AT1 Notes were fixed-income investments backed by one of the world's top financial institutions (Credit Suisse). And for Credit Suisse, attracting those investments was essential to meeting its capital requirements.

**III.     Credit Suisse Appears to Weather a Liquidity Crisis in Late 2022**

58.     Between 2018 and mid-2022, Credit Suisse experienced several challenges to its business.

59.     In 2018, Credit Suisse was implicated in various corporate scandals involving clients of the bank, such as Petrobras (a Brazilian energy company) and FIFA (the world governing body of soccer). In 2019, Credit Suisse was accused of improper surveillance activities. In 2020, the liquidity freeze caused by the pandemic negatively impacted Credit Suisse, as it did many other financial institutions. In 2021, Credit Suisse was embroiled in controversy involving two different funds: Greensill Capital UK and Archegos Capital Management. In the second half of 2021 and

the first quarter of 2022, Credit Suisse reported quarterly losses.  And in mid-2022, the three major credit agencies all downgraded Credit Suisse's credit rating.

60.     Apparently concerned about Credit Suisse's liquidity position following these events, FINMA demanded that Credit Suisse take concrete steps to prepare for a crisis.

61.     In response, Credit Suisse made changes at the very top of its management structure and implemented a strategic review.

62.     In January 2022, Credit Suisse appointed Defendant Lehmann as its new Chairman. Lehmann replaced António Horta-Osório, who resigned just a few months after himself taking the reins.

63.     In July 2022, Credit Suisse hired Defendant Körner as its new CEO.  Körner replaced Thomas Gottstein, who had lasted just two years on the job.

64.     As Credit Suisse's new leadership was pushing to stabilize the bank, Credit Suisse unexpectedly experienced a bank run.

65.     Specifically, on October 1, 2022, a reporter in Australia tweeted that a major investment bank was "on the brink."  Although the journalist did not mention the name of the bank, rumors quickly and widely circulated that Credit Suisse was heading for bankruptcy.

66.     As a result of the ensuing panic, Credit Suisse experienced significantly higher withdrawals of cash deposits as well as non-renewal of maturing time deposits in early October 2022.

67.     However, Credit Suisse did not breach its liquidity coverage ratio because it was still operating under the lower thresholds that had been put in place during the pandemic.

68.     Credit Suisse also had built up a liquidity buffer at this point due to liquidity risk management measures that were imposed during the pandemic.

69.     Yet, the outflows were significant enough that the head of the Swiss National Bank, Thomas Jordan, privately suggested that Credit Suisse be nationalized.  FINMA and Credit Suisse management both opposed the concept of nationalization.  As a result, Credit Suisse was left to its own devices to handle the liquidity crunch.

70.     On October 27, 2022, Credit Suisse announced that it would undertake a strategic restructuring to reduce risk exposure in its investment banking segment and to strengthen its capital position across the organization.

71.     As part of this restructuring, the Saudi National Bank committed to invest CHF 1.5 billion, resulting in total ownership of just under 10% of Credit Suisse's shares.  Credit Suisse raised a total of CHF 4 billion as part of this restructuring effort.

72.     Although Credit Suisse suffered further downgrades from the credit rating agencies, there was no drastic increase in outflows following the new infusion of capital in late 2022.

73.     Indeed, as the fourth quarter progressed, Credit Suisse reported that outflows stabilized and, as of the end of 2022, its LCR was 144%.

74.     Although Credit Suisse appeared to have weathered the crisis in the fall of 2022, it was subsequently revealed, as set forth in greater detail below, that it had not done nearly enough to fortify itself and manage its risks.

**IV.    The Collapse of SVB Reignites Concerns with Respect to Credit Suisse**

75.     On March 10, 2023, Silicon Valley Bank collapsed, representing the largest bank failure since the 2008 financial crisis.

76.     SVB's collapse was triggered in large part by significant withdrawals of cash deposits by SVB customers in the wake of a liquidation announcement by a cryptocurrency-focused bank, Silvergate Capital, two days prior.

77.     When SVB collapsed, US regulators immediately stepped in and appointed the FDIC as receiver.

78.     The collapse of SVB created panic in the market – especially for banks and bank depositors.

79.     Several regional banks suffered significant stock drops as investors started selling bank stocks that were viewed as risky.

80.     Another smaller bank, Signature Bank in New York, quickly collapsed in large part because of increased depositor withdrawals.

81.     To prevent a widespread financial crisis and to protect the U.S. economy, on March 12, 2023, the U.S. Treasury, Federal Reserve, and FDIC jointly announced that all depositors in SVB and Signature Bank would be fully insured (even above the $250,000 maximum) for loss of deposits.

## V.     Credit Suisse's CEO Assures the Market That the Bank's Financial Condition Is "Very Strong"

82.     The collapse of SVB spurred increased scrutiny of Credit Suisse, particularly because of the liquidity crisis it experienced in October 2022.

83.     Depositors who were worried about the safety of their money started withdrawing billions from Credit Suisse.

84.     As a result, the bank run that led to SVB's unexpected collapse posed a new threat to Credit Suisse that was more acute than that posed to other large banks.

85.     Credit Suisse's leadership immediately sought to allay market concerns that Credit Suisse was experiencing liquidity issues that might subject it to the same risks faced by SVB.

86.     On March 14, 2023, Defendant Körner appeared on Bloomberg Television and was questioned about Credit Suisse's position in the wake of the collapse of SVB.  Körner stated that

SVB's failure had not impacted Credit Suisse, saying that the bank had received ***material inflows*** on March 13.  Körner did not provide any information about the bank's outflows, thus suggesting to the market that the bank's deposits on March 13 significantly exceeded its withdrawals.

87.     In addition to telling the market that Credit Suisse was not experiencing a bank run, Körner highlighted the supposedly more stringent Swiss regulatory standards that governed Credit Suisse.

88.     Specifically, Körner asserted that SVB's position was a "very different situation" from Credit Suisse's because – as a large Swiss bank – Credit Suisse was subject to "materially different and higher standards when it comes to capital funding and liquidity."

89.     Körner then commented on the purported strength of Credit Suisse's liquidity and capital positions.  He stated that Credit Suisse's "liquidity coverage ratio" was "strong, very strong" and "***getting stronger as we speak***."

90.     Körner further asserted that the CET1 ratio was "very strong at 14.1%" as reported as of 2022 – and without updating whether there had been a material deterioration in the number since then.

## VI.     Credit Suisse's Creditor Presentation

91.     The same day that Körner appeared on Bloomberg Television, Credit Suisse released a fixed income investor presentation.

92.     In that presentation, Credit Suisse assured investors that the Company's capital structure was strong with a substantial equity cushion below the AT1 Notes.

93.     Regarding liquidity, Credit Suisse stated that "[d]ecisive action had rebuilt liquidity coverage ratio from lower levels in the quarter," and provided the following graphic:



94.     The presentation represented that Credit Suisse's capital exceeded regulatory

requirements:



95.     In another slide, Credit Suisse expressly stated that AT1 capital was "senior" to

CET1 capital:



96.     Finally, on a slide purporting to demonstrate the "Swiss Resolution Regime," Credit Suisse stated that the "NCWOL principle" would apply, which it defined as "NCWOL = No creditor worse off than in liquidation."

97.     Another bullet on the same slide stated, "Strict and complete hierarchy of losses is enforced by law."

98.     A footnote to that statement asserted that "FINMA has the possibility but not the requirement to compensate former shareholders":

## Swiss Resolution Regime



## VII.   Plaintiffs Purchase Credit Suisse's AT1 Notes

99.   Plaintiffs Palomino and Azteca, through Appaloosa, began purchasing AT1 Notes on March 14, 2023.

100.   They purchased more AT1 Notes over the following five days, amassing a substantial position by March 19, 2023.

101.   The AT1 Notes were trading in the United States.  In seeking to purchase those securities on behalf of Palomino and Azteca, Appaloosa received quotes in U.S. dollars.

102.   Many of the AT1 Notes purchased by Plaintiffs have an International Securities Identification Number ("ISIN") beginning with "US".

103.   Furthermore, Plaintiffs paid for their purchases of AT1 Notes in U.S. dollars and through their U.S.-based prime broker, Goldman Sachs.

104.   The counterparty brokers executing Appaloosa's trades appear to have been based in the United States.

105.   Finally, Appaloosa's traders – who were the individuals who placed the orders to purchase AT1 Notes – were all located in New Jersey when the orders were placed.

## VIII.   Credit Suisse's Chairman Assures the Market that Allowing Government Assistance "*Is Not a Topic*"

106.   On March 15, 2023, Defendant Lehmann attended the Financial Sector Conference in Riyadh, Saudi Arabia.

107.   Lehmann was a panelist on the first panel of the day, which was broadcast on CNBC International TV.

108.   The moderator first asked Lehmann if the issues that had contributed to the downfall of SVB were similar to the issues that Credit Suisse had identified during its 2022 strategic review.

109.     Lehmann responded that the SVB situation was ***not comparable*** because SVB was too concentrated in a specific area that ran into problems.  In Credit Suisse's case, according to Lehmann, the Company had already "***taken its medicine***" and had been "significantly de-risking its balance sheet" for more than five months.

110.     The moderator then asked Lehmann if Credit Suisse would "allow some kind of government assistance."  Lehmann responded by resoundingly denying that government assistance was even being discussed:

> That's not a topic.  Look, we are regulated, we have a strong capital
> ratio, a very strong balance sheet, we are all hands on deck, so ***that's***
> ***not a topic whatsoever***.

## IX.     Credit Suisse's Largest Shareholder Casts Doubt over the Bank's Liquidity, but Defendants Deny That the Bank Is in Trouble

111.     Another attendee at the Financial Sector Conference in Riyadh on March 15, 2023, was the Chairman of the Saudi National Bank, Ammar Al Khudairy ("Al Khudairy").

112.     After Lehmann spoke, Al Khudairy was interviewed by a Bloomberg reporter in the hallway of the conference.

113.     In response to a question about whether the Saudi National Bank – which had provided a large capital infusion to Credit Suisse in October 2022 – would increase its investment in Credit Suisse, Al Khudairy replied emphatically:  "The answer is absolutely not, for many reasons.  I'll cite the simplest reason, which is regulatory and statutory.  We now own 9.8% of the bank — if we go above 10% all kinds of new rules kick in, whether be it by our regulator or the European regulator or the Swiss regulator."

114.     The interview was broadcast by Bloomberg Television with the chyron:  "Credit Suisse Top Shareholder Rules Out More Assistance to the Bank."

115.    In response to this news, Credit Suisse's share price plummeted by more than 30%. The price of the AT1 Notes also fell dramatically.

116.    In an interview with CNA's Asia Tonight that same day, Körner was asked how Credit Suisse was "going to stop the bleeding" caused by Al Khudairy's statement.

117.    Rather than concede that Credit Suisse was suffering liquidity outflows, Körner painted a very rosy picture of Credit Suisse's liquidity position.

118.    First, he reiterated his comments from the previous day that Credit Suisse was subject to higher liquidity and capital requirements than other smaller banks, which meant that its position was "not comparable" to SVB's.

119.    He then assured the market that Credit Suisse was not having liquidity issues, stating that "we fulfill, and overshoot basically, all regulatory requirements.  Our capital, our liquidity basis, is very, very strong."

120.    Credit Suisse then tweeted out that exact quote:



## X.    Credit Suisse Accepts Government Assistance

121.    By the afternoon of Wednesday, March 15, 2023, the financial press was reporting that Credit Suisse was in discussions with Swiss authorities about ways to stabilize the bank.

122.    Potential options included a public showing of support and a backstop from the Swiss government.

123. Also reportedly being discussed was a potential deal with UBS, although both Credit Suisse and UBS were allegedly opposed to a forced takeover of Credit Suisse by UBS.

124. Later that day, FINMA and the Swiss National Bank issued a public statement that Credit Suisse was in compliance with Swiss capital and liquidity requirements, but that the Swiss National Bank could provide Credit Suisse with liquidity if needed. The statement read:

**FINMA and the SNB issue statement on market uncertainty**

The Swiss Financial Market Supervisory Authority FINMA and the Swiss National Bank SNB assert that the problems of certain banks in the USA do not pose a direct risk of contagion for the Swiss financial markets. The strict capital and liquidity requirements applicable to Swiss financial institutions ensure their stability. Credit Suisse meets the capital and liquidity requirements imposed on systemically important banks. If necessary, the SNB will provide CS with liquidity.

FINMA and the SNB are pointing out in this joint statement that there are no indications of a direct risk of contagion for Swiss institutions due to the current turmoil in the US banking market.

Regulation in Switzerland requires all banks to maintain capital and liquidity buffers that meet or exceed the minimum requirements of the Basel standards. Furthermore, systemically important banks have to meet higher capital and liquidity requirements. This allows negative effects of major crises and shocks to be absorbed.

**Credit Suisse meets regulatory capital and liquidity requirements**

Credit Suisse's stock exchange value and the value of its debt securities have been particularly affected by market reactions in recent days. FINMA is in very close contact with the bank and has access to all information relevant to supervisory law. Against this background, FINMA confirms that Credit Suisse meets the higher capital and liquidity requirements applicable to systemically important banks. In addition, the SNB will provide liquidity to the globally active bank if necessary. FINMA and the SNB are following developments very closely and are in close contact with the Federal Department of Finance to ensure financial stability.

125.    The following morning, on Thursday, March 16, 2023, before Swiss markets opened, Credit Suisse issued a press release disclosing that it intended to ***borrow up to CHF 50 billion*** from the Swiss National Bank.

126.    In the press release, Körner was quoted as saying:  "These measures demonstrate decisive action to strengthen Credit Suisse as we continue our strategic transformation to deliver value to our clients and other stakeholders.  We thank the SNB and FINMA as we execute our strategic transformation."

127.    Thus, *just a few hours* after Körner told CNA that Credit Suisse's liquidity was "very, very strong," and not more than a day after Lehmann publicly stated that Credit Suisse's acceptance of government assistance "was not a topic," Credit Suisse accepted an emergency backstop from the Swiss government to try to ward off a liquidity crisis.  In doing so, Credit Suisse became the first major global bank to tap an emergency lifeline since the 2008 financial crisis.

128.    That same day, according to Reuters, Credit Suisse executives issued a memo to their employees in the form of "talking points," stating that the central bank loan did not trigger a Viability Event.

129.    Certain employees' bonuses were paid in securities that incorporated the same triggers as AT1 write-downs, including a Viability Event.  Specifically, 5,000 Credit Suisse employees had bonuses tied to these triggers.  Thus, Credit Suisse's "talking points" memo would calm these employees' fears that their bonuses might not be paid despite the bank's faltering liquidity position.

## XI.    Swiss Authorities Orchestrate an Emergency Takeover of Credit Suisse by UBS, Wiping Out the AT1 Notes

130.    The loan from the Swiss National Bank did little to boost confidence in Credit Suisse.

131.    On Friday, March 17, 2023, the Wall Street Journal reported that large investors and other banks had pulled back their exposure to Credit Suisse.  In addition, Credit Suisse's counterparties were requesting guarantees in order to conduct business with the bank, creating additional liquidity pressure.

132.    It was subsequently revealed that Credit Suisse was borrowing more from the Swiss National Bank than it had announced it intended to borrow, and customer outflows had been as high as CHF 10 billion per day that week.

133.    On the afternoon of March 17, 2023, it was reported that UBS was in talks to acquire Credit Suisse, with both banks' Boards scheduled to meet over the weekend.  However, there was no reporting, or suggestion, that the deal would require that Credit Suisse AT1 holders be wiped out.

134.    The AT1 Notes market received this news positively because investors had not been led to believe that a takeover by UBS would somehow require a write-down of the notes.

135.    Market participants apparently believed that UBS would buy out Credit Suisse with potentially *no losses* to the AT1 Notes at all.

136.    However, AT1 investors were completely unaware that Swiss authorities could sell Credit Suisse to UBS only if the Swiss government provided additional support and agreed to a write-down of the AT1 Notes.

137.    On Sunday, March 19, 2023, FINMA announced a merger of UBS and Credit Suisse.

138.    UBS agreed to pay CHF 3 billion to Credit Suisse shareholders in UBS stock as part of the deal.  The Swiss government agreed to backstop UBS for CHF 9 billion in losses that

it might suffer by taking over Credit Suisse.  The Swiss National Bank also agreed to provide another CHF 200 billion in liquidity.

139.    In its press release announcing the deal, FINMA revealed that Credit Suisse had experienced significant outflows of funds and that its situation had intensified after the collapse of SVB:

> The Credit Suisse Group is experiencing a crisis of confidence, which has manifested in considerable outflows of client funds.  This was intensified by the upheavals in the US banking market in March 2023.  There was a risk of the bank becoming illiquid, even if it remained solvent, and it was necessary for the authorities to take action in order to prevent serious damage to the Swiss and international financial markets.

140.    As part of the transaction, the AT1 Notes were written down to zero.  FINMA subsequently asserted that writing off the AT1 Notes was a "necessary part of the overall package."

141.    On March 23, 2023, in response to significant backlash from blindsided AT1 Noteholders, FINMA issued a press release providing the purported basis for the write-down.

142.    First, FINMA stated that there was a contractual basis for the write-down due to the occurrence of a Viability Event triggered by "extraordinary government support [being] granted."  According to FINMA, "Credit Suisse was granted extraordinary liquidity assistance loans secured by a federal default guarantee" on March 19, 2023.

143.    Second, FINMA stated that the emergency ordinance it passed on March 19, 2023, expressly authorized it to instruct Credit Suisse to write down AT1 capital instruments.  According to FINMA, "the Federal Council enacted the Emergency Ordinance on Additional Liquidity Assistance Loans and the Granting of Federal Default Guarantees for Liquidity Assistance Loans by the Swiss National Bank to Systemically Important Banks," which authorized FINMA "to order the borrower and the financial group to write down Additional Tier 1 capital."

XII.   **Defendants Change Their Story**

144.   On April 4, 2023, Credit Suisse held its final annual shareholder general meeting.

145.   Lehmann and Körner both gave speeches during the meeting, expressing remorse for what had transpired and appearing contrite for the harm that investors had suffered.

146.   Some of their remarks, however, directly contradicted what they told the market during the week of March 13, 2023.

147.   First, Defendants *admitted* that Credit Suisse was in a weak liquidity position heading into March 2023, primarily because of the outflows it had experienced in October 2022, which was flatly inconsistent with their statements on March 14-16 that Credit Suisse had strong and improving liquidity.

148.   At the shareholder meeting, Körner stated: "The bank had been significantly weakened by the strong outflows in October 2022 as a result of unfounded rumors and speculation. . . .  My colleagues on the Executive Board and I also spent a lot of time in reaching out directly to clients to convince them to stay with the bank or to come back to us.  The situation then stabilized somewhat at the beginning of 2023 in spite of a difficult geopolitical and macroeconomic environment.  ***But despite all our efforts, we could no longer reverse the loss of trust***."

149.   Lehmann made a similar comment:  "The period from October to March was not long enough.  One legacy issue after another had already seen trust eroded – and with it, patience dwindled.  At that, we failed.  It was too late.  The bitter reality is that there wasn't enough time for our strategy to bear fruit."

150.   Second, Defendants *admitted* that the collapse of SVB had a profound impact on Credit Suisse, notwithstanding their assurances that what happened to SVB had no bearing on Credit Suisse.

151.     Körner commented:  "The sudden collapse of Silicon Valley Bank and Signature Bank in the US caused shockwaves around the world and triggered a dramatic loss of confidence in the global financial industry.  ***We were particularly vulnerable at the time***."

152.     Third, Defendants *admitted* that they started having concerns at the "beginning" of the week of March 13.

153.     Lehmann remarked:  "***Until the beginning of the fateful week, I believed in a successful turnaround***.  However, rising interest rates, inflation, and market volatility shook sentiment, and following the issues around US banks, there were fears of global contagion.  Social media and digitalization fanned the flames of this fear.  This hit us at our most vulnerable in mid-March."

154.     Lehmann remarked that the problems intensified later in the week, but made it clear that there were problems at the beginning of the week:  "[T]he downward spiral of events leading to this fateful week intensified later in that week, swallowing everything up.  The bank could not be saved."

## XIII.   Swiss Prosecutors Investigate the Legality of the Forced Takeover

155.     On April 2, 2024, Switzerland's Office of the Attorney General announced that it was opening an investigation because "numerous aspects of events around Credit Suisse" warranted investigation and needed to be analyzed to "identify any criminal offences."

156.     The prosecutor continued:  "The Office of the Attorney General wants to proactively fulfil its mandate and responsibility to contribute to a clean Swiss financial center and has set up a monitoring system so that it can take action immediately on any issues that fall within its area of responsibility."

## XIV.  **FINMA Issues Its Report About the Collapse of Credit Suisse**

157.    On December 19, 2023, FINMA issued a report titled "Lessons Learned from the CS Crisis."

158.    Contrary to Defendants' representations on March 14 through March 16, 2023, FINMA asserted that in mid-March 2023, "***there was an imminent threat of CS becoming insolvent***" during that fateful week.

159.    The FINMA report disclosed the amount of daily *outflows* that Credit Suisse experienced during the week of March 13, 2023.  Unbeknownst to the market at the time, Credit Suisse was experiencing tens of billions of dollars of material outflows during the "fateful week":

| Date | Outflows |
|---|---|
| Monday, March 13, 2023 | CHF 1.6 billion |
| Tuesday, March 14, 2023 | CHF 2.7 billion |
| Wednesday, March 15, 2023 | CHF 13.2 billion |
| Thursday, March 16, 2023 | CHF 17.1 billion |
| Friday, March 17, 2023 | CHF 10.1 billion |

160.    Additionally, because of Credit Suisse's "acute liquidity problems," its counterparties to transactions demanded additional collateral from Credit Suisse, creating further stress on Credit Suisse's already precarious liquidity position.

161.    According to FINMA, Credit Suisse had only one viable option:  a merger by absorption by UBS.  In FINMA's words, this was "the most expedient and proportionate solution to safeguard the bank's creditors, the Swiss economy and Switzerland's financial system as well as to overcome the crisis of confidence."

162. Thus, although it meant that AT1 Note investors would see their investments reduced to zero, FINMA argued that the acquisition by UBS was necessary to protect the integrity of the Swiss banking system.  There was nothing in the terms of the AT1 Notes themselves that required them to be written down in a sale to UBS.  FINMA wrote off the AT1 Notes in order to make the deal more attractive to UBS.

163. FINMA also identified several "problem areas" for Credit Suisse at the time of its sale to UBS.

164. First, Credit Suisse's strategic revisions had fallen short of and not achieved their intended purposes.  With respect to Credit Suisse's October 2022 change in strategy, FINMA found that "CS had made too few far-reaching changes over the years, and measures and strategy adjustments presented by CS in October 2022 came too late ('too little, too late')."

165. Second, FINMA also found shortcomings in Credit Suisse's risk culture.

166. Third, FINMA concluded that Credit Suisse paid its executives unjustifiably high compensation, even in years when the bank suffered huge losses.  Specifically, ***although Credit Suisse generated a cumulative net loss of CHF 2.1 billion over the past decade, its executives were paid bonuses of CHF 33 billion during the same period***.

167. Fourth, following the October 2022 liquidity crisis, Credit Suisse management did not fully implement necessary measures aimed at strengthening liquidity because doing so would diminish the bank's earnings power, and potentially cause further credit rating downgrades.

168. Finally, although Credit Suisse may have been in compliance with its LCR requirement (at least technically) as of mid-March 2023, that did not mean that Credit Suisse was not having liquidity issues.  The more relevant inquiry was whether Credit Suisse had the forex holdings required to settle payments and transactions, which it did not.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### I.   Körner's Misrepresentations on March 14, 2023

169.    On March 14, 2023, Defendant Körner appeared on Bloomberg Television, where he was asked about Credit Suisse's position in the wake of SVB.  Körner asserted that SVB had not impacted Credit Suisse, stating that the bank had received ***material inflows*** on March 13.

170.    This statement, which caused Credit Suisse AT1 Notes to trade at artificially inflated prices, was materially false and misleading because Credit Suisse had not experienced *material inflows* on March 13, 2023.  As subsequently revealed by FINMA, but unbeknownst to the market at the time, Credit Suisse experienced ***material outflows*** on March 13 of CHF 1.6 billion.

171.    During the interview with Bloomberg Television on March 14, 2023, Defendant Körner referred to SVB's position as a "very different situation" from SVB's because – as a large Swiss bank – Credit Suisse was subject to "materially different and higher standards when it comes to capital funding and liquidity."  He then emphasized the purported strength of Credit Suisse's liquidity, stating that Credit Suisse's "liquidity coverage ratio" was "strong, very strong" and "*getting stronger as we speak*," and highlighted the ratio as of the end of 2022.

172.    These statements, which caused Credit Suisse AT1 Notes to trade at artificially inflated prices, were materially false and misleading because Körner painted a materially misleading picture of Credit Suisse's liquidity position.  As he later admitted at the April 4, 2023 shareholder meeting, Credit Suisse was in a liquidity crisis at this time, accelerated by the SVB collapse.  Credit Suisse was not in a "very different situation" from SVB because like SVB, Credit Suisse was unable to stem the large outflows of cash it was experiencing.  Just the day before, Credit Suisse had experienced material outflows of CHF 1.6 billion.  Moreover, it was materially false and misleading for Körner to state that Credit Suisse's LCR was "strong, very strong" and

"getting stronger as we speak," when there had been material outflows and because the bank did not have the forex holdings required to settle payments and transactions.

## II.   **Misrepresentations in Credit Suisse's March 14, 2023 Fixed Income Presentation**

173.   In its fixed income investor presentation released on March 14, 2023, Credit Suisse stated that it had taken "[d]ecisive actions" to "rebuil[d]" its LCR to 144% as of the end of 2022. It further stated that its LCR "compare[d] favorably to our peer group" and was expected to strengthen as a result of the strategic transformation announced in October 2022.

174.   These statements, which caused Credit Suisse AT1 Notes to trade at artificially inflated prices, were materially false and misleading because at that time – right after the collapse of SVB and the U.S. government's bailout – Credit Suisse was suffering liquidity issues. Furthermore, it was misleading for Credit Suisse to present its LCR on March 14, 2023, as that which existed on December 31, 2022, when there had been immediate outflows that materially impacted Credit Suisse's liquidity position leading up to the presentation and because the bank did not have the forex holdings required to settle payments and transactions.   Moreover, Credit Suisse's LCR did not "compare favorably" to its "peer group" since its closest "peer" was UBS, the bank that was tapped to take it over and stave the liquidity crisis.   Finally, Defendants did not fully implement necessary measures aimed at strengthening liquidity because doing so would diminish the bank's earnings power, and potentially cause further credit rating downgrades, so it was materially misleading for Credit Suisse to represent that the strategic transformation it announced was strengthening liquidity.

## III.   **Lehmann's Misrepresentations on March 15, 2023**

175.   Lehmann's televised statements at the Financial Sector Conference in Riyadh on March 15, 2023, were materially misleading.

176.   First, Lehmann represented that any problems similar to those that plagued SVB

had already been addressed by Credit Suisse.  He told viewers that Credit Suisse had already "taken its medicine," had been "significantly de-risking its balance sheet" for more than five months, and was essentially ahead of the curve in dealing with potential liquidity issues.

177.    These statements, which caused Credit Suisse AT1 Notes to trade at artificially inflated prices, were materially false and misleading because Lehmann painted a materially misleading picture of Credit Suisse's liquidity position.  Credit Suisse was suffering an active liquidity crisis at this time, intensified by the SVB collapse.  The liquidity issues that Credit Suisse experienced in October 2022 left the bank in an extremely vulnerable position.  As FINMA determined in its December 2023 report, Credit Suisse's strategic revisions had fallen short and not achieved their intended purposes.  With respect to Credit Suisse's October 2022 change in strategy, FINMA found that the measures were "too little, too late."  In fact, Defendants did not fully implement necessary measures aimed at strengthening liquidity because doing so would diminish the bank's earnings power, and potentially cause further credit rating downgrades.  Indeed, as Lehmann later admitted at the April 4, 2023 shareholder meeting, Credit Suisse had not fully addressed the issues plaguing the bank before the collapse of SVB.

178.    Second, Lehmann stridently and unequivocally stated during the interview that accepting government assistance "was not a topic" for Credit Suisse.

179.    This statement, which caused Credit Suisse AT1 Notes to trade at artificially inflated prices, was materially false and misleading because Credit Suisse was in a liquidity crisis and suffering a bank run.  Indeed, Credit Suisse accepted CHF 50 billion in government assistance just a few hours after Lehmann made this statement.

**IV.    Körner's Misrepresentations on March 15, 2023**

180.    On the evening of March 15, 2023, Körner told CNA's Asia Tonight that Credit Suisse was not another SVB because it was subject to higher liquidity and capital requirements.

He then assured the market that Credit Suisse was not having liquidity issues, stating that "we fulfill, and overshoot basically, all regulatory requirements.  Our capital, our liquidity basis, is very, very strong."  These statements were then repeated by Credit Suisse on its Twitter account.

181.    These statements, which caused Credit Suisse AT1 Notes to trade at artificially inflated prices, were materially false and misleading because they painted a materially misleading picture of Credit Suisse's liquidity position.  Credit Suisse was suffering an active liquidity crisis at this time, intensified by the SVB collapse.  Credit Suisse was not differently situated from SVB because, notwithstanding its different liquidity standards, Credit Suisse was – like SVB – unable to withstand the large outflows it was experiencing.  Moreover, it was materially misleading for Körner to highlight Credit Suisse's compliance with regulatory requirements when there had been negative developments that materially impacted Credit Suisse's liquidity position and because the bank did not have the forex holdings required to settle payments and transactions.  Indeed, just a few hours later, the Swiss government offered, and Credit Suisse accepted, billions of francs in government-provided liquidity.   Körner's statements created the false impression that Credit Suisse did not need liquidity.

## ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

182.    Plaintiffs repeat and reallege each and every paragraph contained above as if set forth herein.

183.    Defendants Lehmann and Körner acted with scienter with respect to the materially false and misleading statements of material fact set forth above because they knew, or at the very least recklessly disregarded, that those statements were false and misleading when made.  They also had the motive and opportunity to commit fraud.

184.     Following the collapse of SVB, there was intense scrutiny on Credit Suisse's liquidity situation because of the October 2022 liquidity crisis that had pushed Credit Suisse to the brink.

185.     In response to the October 2022 crisis, Lehmann and Körner announced a strategic restructuring of Credit Suisse, which was designed to reduce liquidity risk and strengthen the bank's capitalization.  Lehmann and Körner thus were acutely focused on Credit Suisse's liquidity situation, as it had come to define the first act of their leadership of Credit Suisse, and their tenure would be judged based on their ability to successfully navigate that situation.

186.     In early 2023, Defendants publicly conveyed that their turnaround plan was working.  Specifically, in announcing Credit Suisse's fourth quarter results, the bank stated in its SEC filing (which was signed by Körner):

> **Liquidity issues in 4Q22**
>
> [D]uring early 4Q22, Credit Suisse began experiencing significantly higher withdrawals of cash deposits as well as non-renewal of maturing time deposits.  However, as the quarter progressed, these outflows stabilized to much lower levels but had not yet reversed by year end, and customer deposits declined by CHF 138 billion in 4Q22.  As is normal practice, we also limited our access to the capital markets in the period immediately preceding the strategy announcements we made on October 27, 2022.  While these outflows led us to partially utilize liquidity buffers at the Group and legal entity level, and we fell below certain legal entity-level regulatory requirements, the core requirements of the liquidity coverage ratio (LCR) and the net stable funding ratio (NSFR) at the Group level were maintained at all times.  The Group's three-month average daily LCR was 144% as of the end of 4Q22, improved from lower levels earlier in the quarter.
>
> ***Remediation plans were prepared, initiated and implemented to mitigate these outflows, including accessing the public and private markets***.  We issued over USD 5 billion through three bond sales in November and December 2022, which saw strong investor demand, and an additional CHF 4 billion through our capital increases.  Other steps also include certain asset disposals, including the announced sale of a significant portion of SPG and other related financing

-34-

businesses.  We would note that the ***execution of these actions and other deleveraging measures, including, but not limited to, in the non-core businesses, is also expected to strengthen liquidity ratios and, over time, reduce the funding requirements of the Group***.  As is common for banks, we also continue to have access to central bank funding sources if required.

187.    Lehmann and Körner's strategic restructuring, however, was thrown off the rails by the bank run spurred by the collapse of SVB in March 2023.

188.    Entering the week of March 13, 2023, both Lehmann and Körner were intensely focused on the SVB collapse.  Having supposedly successfully steered Credit Suisse through a liquidity crisis just months after taking over the leadership of the bank, Lehmann and Körner were aware of how vulnerable Credit Suisse was to a bank run.

189.    In April 2023, after Credit Suisse was rescued by UBS and the Swiss government – but with the AT1 Noteholders having been wiped out – both Lehmann and Körner publicly admitted that they had been aware that Credit Suisse was in trouble once SVB collapsed, which was flatly inconsistent with their statements in March 2023 that Credit Suisse had strong and improving liquidity.

190.    Körner told investors that while Credit Suisse's liquidity position had "stabilized somewhat at the beginning of 2023," Credit Suisse "could no longer reverse the loss of trust" once SVB collapsed, and Credit Suisse was "particularly vulnerable at the time."

191.    Lehmann similarly commented:  "The period from October to March was not long enough.  One legacy issue after another had already seen trust eroded – and with it, patience dwindled.  At that, we failed.  It was too late.  The bitter reality is that there wasn't enough time for our strategy to bear fruit."

192.    Although Lehmann may have believed early in 2023 that the turnaround strategy was working, he admitted that by March 13, 2023, he no longer had that view:  "Until the beginning

of the fateful week, I believed in a successful turnaround.  However, rising interest rates, inflation, and market volatility shook sentiment, and following the issues around US banks, there were fears of global contagion.  Social media and digitalization fanned the flames of this fear.  This hit us at our most vulnerable in mid-March."

193.    Given their knowledge of how vulnerable Credit Suisse's liquidity position was at the time, it was – at the very least – reckless for Körner and Lehmann to tell the market that Credit Suisse's liquidity position was strong and that Credit Suisse was differently situated from – and not susceptible to the same fate as – SVB.

194.    It was also – at the very least – reckless of Lehmann to tell the market that acceptance of government assistance was "not a topic whatsoever" on March 15, 2023.  The head of the Swiss National Bank privately suggested that Credit Suisse be nationalized in late 2022, but Lehmann and Körner had resisted, instead seeking the opportunity to implement their own turnaround plan for Credit Suisse.  Knowing that Credit Suisse was in a weakened state and that nationalization had already been proposed, it was disingenuous for Lehmann to suggest that acceptance of government assistance by Credit Suisse was not on the table.

195.    Indeed, later that day, FINMA and the Swiss National Bank issued a press release stating that the Swiss National Bank could provide Credit Suisse with liquidity if needed, which assistance Credit Suisse accepted just a few hours later.  To state that the acceptance of such assistance was not even being contemplated as a possibility on the morning of March 15, 2023, defies credulity.

196.    Körner and Lehmann also had a motive to mislead the markets.

197.    The collapse of SVB caused banking customers to withdraw their money from financial institutions that were viewed as potentially unstable, which included Credit Suisse.

198.     Given Credit Suisse's vulnerable liquidity position at that time, a large enough bank run would have led to Körner and Lehmann having to leave their executive positions.

199.     The only way for Körner and Lehmann to prevent this from happening was to convince Credit Suisse's depositors not to withdraw their money, and Credit Suisse counterparties not to demand additional collateral.  To do this, Körner and Lehmann had an incentive to mislead the market that Credit Suisse was not in the weakened liquidity position that it was in.  If their lies were believed, the situation *might* stabilize and Credit Suisse might well continue to exist with Körner and Lehmann at the helm as conquering heroes, having seemingly weathered a second liquidity crisis.  The lies gave them a (false) chance – while the truth did not.

200.     Additionally, certain members of Credit Suisse management's bonuses were paid in securities that would be written down if a Viability Event occurred.  Thus, Körner and Lehmann were incentivized to convince the market that government assistance was not needed (which might be considered to have triggered a Viability Event) in order to protect their colleagues' lucrative compensation.

201.     Many other factors – which were unknown to the investing public at the time, but have since been revealed – also establish that Körner and Lehmann acted with scienter.

202.     The propriety of UBS's takeover of Credit Suisse is currently being investigated by Switzerland's federal prosecutor.  The federal prosecutor's public announcement that it would be pursuing potential criminal charges around the collapse of Credit Suisse buttresses that there was intentional wrongdoing.

203.     FINMA has identified shortcomings in Credit Suisse's risk culture that existed in March 2023.  Credit Suisse's complex corporate structure hampered rigorous decision making,

meaning that Körner and Lehmann were not in the position that they represented they were in to implement measures to prevent Credit Suisse from suffering a fate similar to SVB.

204.    FINMA has also disclosed that Credit Suisse's incentive structure was not aligned with the interests of the bank's customers and investors.  Credit Suisse paid its executives unjustifiably high compensation, even in years when the bank suffered huge losses.  Körner and Lehmann were incentivized to preserve Credit Suisse's independence from the Swiss government in order to continue to be able to receive lucrative compensation.

205.    Following an investigation, FINMA has also found that, prior to March 2023, Körner and Lehmann did not fully implement necessary measures aimed at strengthening liquidity. They did not do so because these measures would diminish the bank's earnings power, and potentially cause further credit rating downgrades.  Thus, at the same time they were touting the strength of Credit Suisse's liquidity while faced with a bank run, Körner and Lehmann knew that they had not positioned the bank to survive such a crisis.

206.    As the most senior executives of Credit Suisse during the relevant time period, Defendants Körner's and Lehmann's scienter is imputable to Credit Suisse.

## PRESUMPTION OF RELIANCE

207.    Plaintiffs intend to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (a) Defendants made public misrepresentations or failed to disclose material facts during the relevant time period; (b) the omissions and misrepresentations were material; (c) the AT1 Notes traded in an efficient market; (d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of AT1 Notes; and (e) Plaintiffs purchased Credit Suisse AT1 Notes between the time Defendants misrepresented or failed to disclose material facts and the time when the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

208.    As a result of the aforementioned materially false and misleading statements, Credit Suisse AT1 Notes traded at artificially inflated prices during the relevant period.  The artificial inflation continued until the time the market fully came to realize the nature and extent of Defendants' misrepresentations concerning Credit Suisse's liquidity issues.

209.    At all relevant times, the market for Credit Suisse AT1 Notes was efficient for the following reasons, among others:  (a) Credit Suisse filed periodic reports with the SEC; (b) numerous analysts followed Credit Suisse; and (c) Credit Suisse regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

210.    Plaintiffs relied on the market price of Credit Suisse AT1 Notes, which reflected all relevant information in the market, including the misstatements by Defendants.

## PLAINTIFFS' ACTUAL RELIANCE

211.    During the relevant period, Palomino's and Azteca's investment in Credit Suisse AT1 Notes was managed by Appaloosa.  Appaloosa made the investment decisions with respect to the purchases of Credit Suisse AT1 Notes.  Factors considered by Appaloosa in making such decisions included, among other things, Defendants' statements about Credit Suisse's purportedly strong liquidity position, Credit Suisse being differently situated from SVB, and Credit Suisse's acceptance of government assistance not being a "topic whatsoever."

212.    Prior to making the decision to purchase Credit Suisse AT1 Notes, an Appaloosa investment professional actually and justifiably read (or listened to), reviewed and relied upon Körner's March 14, 2023 interview on Bloomberg television, Credit Suisse's March 14, 2023 fixed income presentation, Lehmann's televised interview at the Financial Sector Conference in Riyadh

on March 15, 2023, and Körner's statements on CNA's Asia Tonight on March 15, 2023, including:  (a) the statements that the bank had received material inflows on March 13, 2023; (b) the statement that Credit Suisse was in a "very different situation" from SVB's because – as a large Swiss bank – Credit Suisse was subject to "materially different and higher standards when it comes to capital funding and liquidity"; (c) the statement that Credit Suisse's "liquidity coverage ratio" was "strong, very strong" and "getting stronger as we speak"; (d) the statements that Credit Suisse had taken "[d]ecisive actions" to "rebuil[d]" its LCR to 144% as of the end of 2022 and that its LCR "compare[d] favorably to our peer group" and was expected to strengthen as a result of the strategic transformation announced in October 2022; (e) the statement that Credit Suisse had already "taken its medicine," had been "significantly de-risking its balance sheet" for more than five months, and was essentially ahead of the curve in dealing with potential liquidity issues; (f) the statement that Credit Suisse's acceptance of government assistance "was not a topic whatsoever" for Credit Suisse on March 15; and (g) the statement that Credit Suisse was not having liquidity issues, and that "we fulfill, and overshoot basically, all regulatory requirements.  Our capital, our liquidity basis, is very, very strong."

213.    Appaloosa actually and justifiably relied upon statements made during Körner's March 14, 2023 interview on Bloomberg television, Credit Suisse's March 14, 2023 fixed income presentation, Lehmann's televised interview at the Financial Sector Conference in Riyadh on March 15, 2023, and Körner's statements on CNA's Asia Tonight on March 15, 2023 (to the extent each such statement was made at the time) in making each purchase of Credit Suisse AT1 Notes as set forth on Exhibits A and B.

## **LOSS CAUSATION**

214.    As the truth about Credit Suisse's faltering liquidity position and its acceptance of government assistance gradually and slowly leaked into the market – and as the foreseeable risks

previously concealed by Defendants' material misstatements and omissions partially materialized – the price of Credit Suisse AT1 Notes dropped precipitously.

215. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs.  During the time that Plaintiffs purchased Credit Suisse AT1 Notes, as set forth in Exhibits A and B, the market price of those securities was artificially inflated as a direct result of Defendants' materially false and misleading statements.  Specifically, Defendants' false and misleading statements about Credit Suisse's liquidity and whether it would accept government assistance caused the price of Credit Suisse AT1 Notes to be artificially inflated.

216. Plaintiffs' losses were the result of a series of partial but inadequate disclosures correcting the prior false and misleading statements with respect to Credit Suisse's faltering liquidity position and its acceptance of government assistance.  As the foreseeable risks previously concealed by Defendants' material misstatements and omissions partially materialized, the price of Credit Suisse AT1 Notes declined precipitously, damaging Plaintiffs.

217. On March 15, 2023, the Chairman of the Saudi National Bank, Al Khudairy, was interviewed by a Bloomberg reporter in the hallway of the Financial Sector Conference in Riyadh. In response to a question about whether the Saudi National Bank – which had provided a large capital infusion to Credit Suisse in October 2022 – would increase its investment in Credit Suisse, Al Khudairy replied emphatically:  "The answer is absolutely not, for many reasons.  I'll cite the simplest reason, which is regulatory and statutory. We now own 9.8% of the bank — if we go above 10% all kinds of new rules kick in, whether be it by our regulator or the European regulator or the Swiss regulator."  The interview was broadcast by Bloomberg Television with the chyron: "Credit Suisse Top Shareholder Rules Out More Assistance to the Bank."

218.    In response to this news, the price of Credit Suisse's AT1 Notes fell.  For example, the Credit Suisse issued AT1 Note identified by ISIN number US225401AJ72 fell from a closing price of 72.42 cents on the dollar on March 14, 2023 to 38.53 cents on the dollar on March 15, 2023 per TRACE data.  AT1 Notes generally fell by approximately 40-50% of their March 14, 2023 closing prices by the close of trading on March 15, 2023.

219.    On Friday, March 17, 2023, the Wall Street Journal reported that large investors and other banks had pulled back their exposure to Credit Suisse.  That afternoon, it was reported that UBS was in talks to acquire Credit Suisse, with both banks' Boards scheduled to meet over the weekend.

220.    In response to this news, the price of Credit Suisse's AT1 Notes fell.  For example, the Credit Suisse issued AT1 Note identified by ISIN number US225401AJ72 fell from a closing price of 37.19 on March 16, 2023 to 25.08 at close on March 17, 2023.  AT1 Notes generally fell by significant amounts as between their March 16, 2023 closing prices by the close of trading on March 17, 2023.

221.    The Wall Street Journal article was released during traditional market hours.

222.    AT1 Note trading continued OTC over the weekend, with certain brokers keeping their trading desks open to allow for AT1 Note trading.

223.    On Sunday, March 19, 2023, FINMA announced a "merger" of UBS and Credit Suisse.  UBS agreed to pay CHF 3 billion to Credit Suisse shareholders in UBS stock as part of the deal.  The Swiss government agreed to backstop UBS for CHF 9 billion in losses that it might suffer by taking over Credit Suisse.  The Swiss National Bank also agreed to provide another CHF 200 billion in liquidity.

224.    In its press release announcing the deal, FINMA stated:

> The Credit Suisse Group is experiencing a crisis of confidence, which has manifested in considerable outflows of client funds. This was intensified by the upheavals in the US banking market in March 2023. There was a risk of the bank becoming illiquid, even if it remained solvent, and it was necessary for the authorities to take action in order to prevent serious damage to the Swiss and international financial markets.

225.    As part of the transaction, FINMA instructed Credit Suisse to write the AT1 Notes to zero. FINMA subsequently disclosed that because the merger was negotiated under "high pressure" circumstances, writing off the AT1 Notes (so that UBS did not have to pay for them) was a "necessary part of the overall package."

226.    AT1 Notes were cancelled as a result of the UBS transaction. AT1 Notes thus had zero value as of market open on March 20, 2023.

227.    Trading in what were now effectively claims related to the AT1 Notes continued, with AT1 Note claims generally trading at 3 to 4 cents on the dollar, far below the prices on March 17, 2023. For example, Credit Suisse issued AT1 Note identified by ISIN number US225401AJ72 was cancelled by the UBS transaction. At close of trading on March 17, 2023, the Note was trading at 25.08. By close of trading on March 20, 2023, claims related to the Note were trading at 3.3 – a fall of nearly 90%.

228.    In the alternative, Plaintiffs' losses are the result of a market for AT1 Notes being created on March 14, 2023 and continuing through the cancellation of the AT1 Notes immediately coinciding with the UBS merger, which would not have existed absent Defendants' material misrepresentations. As of March 14, 2023, Credit Suisse was already suffering material outflows and a bank run. Had Defendants admitted the full truth regarding the material outflows and the bank run on March 14, 2023, instead of making false and misleading statements, the market for AT1 Notes would have effectively ceased to exist. Without Defendants' misrepresentations, depositor outflows would have occurred faster, counter-party collateral calls would have occurred

faster, and the acceptance by Credit Suisse of government assistance, followed by the cancellation of the AT1 Notes, would have occurred faster, if not immediately. Ultimately, Defendants' misrepresentations were not successful in saving Credit Suisse from a takeover by UBS, having only succeeded in buying Defendants a week of time. *Without* the misrepresentations, which reassured not just AT1 Noteholders but also depositors, creditors, counterparties, and the like, Credit Suisse would have been forced into a rescue as early as March 14, 2023, and thus the market for AT1 Notes would have ceased to exist as early as March 14, 2023. This is because AT1 Notes did not simply lose value as a result of the UBS takeover, but were actually *cancelled as securities entirely*. Plaintiffs are entitled to the full value paid for the AT1 Notes.

229.    In the alternative, Plaintiffs' losses are the result of being denied the benefit of the bargain to which an AT1 Noteholder was entitled. With Plaintiffs having purchased AT1 Notes as a result of Defendants' fraudulent conduct and thus becoming the rightful beneficiaries of the AT1 Notes they purchased, Plaintiffs had a right to the bargain in which they engaged. They had an expectation that the interest payments would be made, and the notes redeemed by Credit Suisse in due course. Instead, the Notes were ultimately cancelled. If Defendants' false statements had been accurate, had Credit Suisse in fact had a strong liquidity position, had the acceptance of government assistance not been a topic, and had Credit Suisse no parallels to SVB, Credit Suisse would have survived the fateful week and AT1 Noteholders, including Plaintiffs, would have every expectation of being redeemed in full. Plaintiffs are entitled to the full redemption value of the AT1 Notes they purchased as a result of Defendants' fraud.

## NO SAFE HARBOR

230.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not "forward-looking statements" nor were they

identified as "forward-looking statements" when made.  Nor was it stated with respect to any of the statements forming the basis of this Complaint that actual results "could differ materially from those projected."  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Credit Suisse who knew that those statements were false when made.

### NEW JERSEY RICO

231.    Defendants also violated New Jersey's Racketeer Influenced and Corrupt Organizations Act, N.J.S.A. § 2C-41-1, *et seq.*, which prohibits the involvement in the affair of an enterprise through a pattern of racketeering activity.

232.    Defendants were employed by or associated with an enterprise and conducted the affairs of that enterprise through a pattern of racketeering activity, and Defendants conspired to conduct that illicit activity.

233.    Starting at least in October 2022, Defendants created an illegal enterprise at Credit Suisse designed to prevent a run on the bank through the dissemination of false and misleading statements concerning Credit Suisse's liquidity position.  This enterprise purposefully enriched its members, including Defendants, by delaying the collapse of the bank until mid-March 2023.

234.    On October 1, 2022, a reporter in Australia tweeted that a major investment bank was "on the brink."  Although the journalist did not mention the name of the bank, rumors quickly and widely circulated that Credit Suisse was heading for bankruptcy.

235.     As a result of the ensuing panic, Credit Suisse experienced significantly higher withdrawals of cash deposits as well as non-renewal of maturing time deposits in early October 2022.

236.     The outflows were significant enough that the head of the Swiss National Bank privately suggested that Credit Suisse be nationalized.   Defendants opposed the concept of nationalization.

237.     On October 27, 2022, Credit Suisse announced that it would undertake a strategic restructuring to reduce risk exposure in its investment banking segment and to strengthen its capital position across the organization.

238.     Defendants told the market that these measures were working.   In announcing Credit Suisse's fourth quarter results, Defendants represented that they had weathered the liquidity crisis in October 2022 and "prepared, initiated, and implemented" remediation plans to mitigate the impact of the liquidity outflows.   They further represented that Credit Suisse's liquidity position was expected to strengthen because of Defendants' "execution of these actions and other deleveraging measures."

239.     However, as FINMA has now revealed following an investigation, Defendants did not fully implement necessary measures aimed at strengthening liquidity because these measures would diminish the bank's earnings power, and potentially cause further credit rating downgrades, which would negatively impact Defendants.

240.     FINMA also identified shortcomings in Credit Suisse's risk culture.

241.     Defendants had financial incentives for conducting a pattern of racketeering activity.  Credit Suisse paid its executives unjustifiably high compensation, even in years when the bank suffered huge losses.  Specifically, although Credit Suisse generated a cumulative net loss of

CHF 2.1 billion over the past decade, its executives were paid bonuses of CHF 33 billion during the same period.

242.   The enterprise's pattern of racketeering intensified with the fall of SVB in March 2023.  Having survived a liquidity crisis in October 2022, Credit Suisse was susceptible to a bank run when the collapse of SVB sent shockwaves through the global banking industry.

243.   The only way for Körner and Lehmann to prevent a bank run from happening was to convince Credit Suisse's depositors not to withdraw their money, and Credit Suisse counterparties not to demand additional collateral.  To do this, Körner and Lehmann had to mislead the market that Credit Suisse was not in the weakened liquidity position that it was in.  If their lies were believed, the situation *might* stabilize and the enterprise could continue.

244.   During the week of March 13, 2023, Defendants made a series of material misrepresentations concerning Credit Suisse's outflows, its liquidity, and whether it would accept government assistance, as detailed in paragraphs 169 through 181 above.

245.   Each of the enterprise's intentional misrepresentations constitutes a violation of Sections 10(b) of the Exchange Act and gives rise to a separate claim of securities fraud, and, as such, each constitutes a separate predicate act of racketeering under New Jersey RICO.

246.   The enterprise's material misstatements and omissions caused Credit Suisse's AT1 Notes to trade at artificially inflated prices.

247.   As detailed in paragraphs 169 through 181 above, the statements were materially false and/or misleading because:

> (a)   Credit Suisse had not experienced material inflows on March 13, 2023. Credit Suisse experienced material outflows on March 13 of CHF 1.6 billion;
>
> (b)   Credit Suisse's liquidity position was weakening, not getting stronger at that time;

    (c)      Credit Suisse was the subject of a bank run by March 13, 2023;

    (d)      Credit Suisse did not have the forex holdings required to settle payments and transactions at that time;

    (e)      Defendants did not fully implement necessary measures aimed at strengthening liquidity after October 2022 because doing so would diminish the bank's earnings power, and potentially cause further credit rating downgrades;

    (f)      Defendants' strategic revisions announced in October 2022 had fallen short of and not achieved their intended purposes by March 2023; and

    (g)      Whether Credit Suisse would accept government assistance – rather than not being a "topic whatsoever – was something being considered by the enterprise on March 15, 2023.

248.    As detailed in paragraphs 214 through 229 above, Defendants' violation of New Jersey RICO caused injuries to Plaintiffs' property.

249.    During the time that Plaintiffs purchased Credit Suisse AT1 Notes, the market price of those securities was artificially inflated as a direct result of Defendants' materially false and misleading statements.  Plaintiffs' losses were the result of a series of partial but inadequate disclosures correcting the prior false and misleading statements with respect to Credit Suisse's faltering liquidity position and its acceptance of government assistance.  As the foreseeable risks previously concealed by Defendants' material misstatements and omissions partially materialized, the price of Credit Suisse AT1 Notes declined precipitously, damaging Plaintiffs.

250.    In the alternative, Plaintiffs' losses are the result of a market for AT1 Notes being created on March 14, 2023, and continuing through the cancellation of the AT1 Notes immediately coinciding with the UBS merger, which would not have existed absent Defendants' material misrepresentations.

251.    In the alternative, Plaintiffs' losses are the result of being denied the benefit of the bargain to which an AT1 Noteholder was entitled.

252.     The enterprise's scheme had substantial contacts with the state of New Jersey.

253.     Credit Suisse is registered to do business, and maintains offices in, New Jersey.

254.     Appaloosa maintains its principal place of business in Short Hills, New Jersey.

255.     Appaloosa's traders – who were the individuals who placed the orders to purchase AT1 Notes – were all located in New Jersey when the orders were placed.

256.     The scheme thus had numerous, significant, foreseeable, and intended adverse effects in New Jersey.

## FIRST CAUSE OF ACTION

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### By Plaintiffs Palomino and Azteca Against All Defendants

257.     Plaintiffs repeat and reallege each and every paragraph contained above as if set forth herein.

258.     This cause of action is brought by Plaintiffs Palomino and Azteca against Defendants Credit Suisse, Lehmann, and Körner for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

259.     Defendants Credit Suisse, Lehmann, and Körner both directly and indirectly used the means and instrumentalities of interstate commerce in the United States to make the materially false and misleading statements and omissions of material fact alleged herein to:  (i) deceive the investing public, including Plaintiffs, as alleged herein; (ii) artificially inflate and maintain the market price of Credit Suisse AT1 Notes; and (iii) cause Plaintiffs to purchase Credit Suisse AT1 Notes at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Credit Suisse, Lehmann, and Körner took the actions set forth above.

260.     Defendants Credit Suisse, Lehmann, and Körner both directly and indirectly:  (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material fact

and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Credit Suisse AT1 Notes in an effort to artificially inflate and maintain the market prices for Credit Suisse AT1 Notes in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

261.    By virtue of their high-level positions at the Company, Lehmann and Körner were authorized to make public statements, and made public statements on Credit Suisse's behalf. These senior executives were privy to and participated in the creation, development, and issuance of the materially false and misleading statements alleged herein, and/or were aware of the Company's and their own dissemination of information to the investing public that they recklessly disregarded was materially false and misleading.

262.    In addition, Credit Suisse, Lehmann, and Körner had a duty to disclose truthful information necessary to render their affirmative statements not materially misleading so that the market price of the Company's securities would be based on truthful, complete, and accurate information.

263.    Defendants Credit Suisse, Lehmann, and Körner acted with knowledge or reckless disregard for the truth of the misrepresented and omitted facts alleged herein, in that they failed to ascertain and disclose the facts, even though such facts were known or readily available to them. Defendants Credit Suisse's, Lehmann's, and Körner's material misrepresentations and omissions were done knowingly and/or recklessly, and had the effect of concealing the truth with respect to Credit Suisse's operations, business, performance, and prospects from the investing public, including misreporting Credit Suisse's purportedly strong liquidity position and supposed ability to withstand a bank run caused by the collapse of SVB.  By concealing these material facts from

investors, Credit Suisse, Lehmann, and Körner supported the artificially inflated price of Credit Suisse's AT1 Notes.

264.    The dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, artificially inflated the market price of Credit Suisse's AT1 Notes.  In ignorance of the fact that the market prices were artificially inflated, and relying directly or indirectly upon the materially false and misleading statements made by Defendants, and upon the integrity of the market in which the Company's securities traded, or upon the absence of material adverse information that was recklessly disregarded by Defendants, but not disclosed in public statements by Defendants, Plaintiffs purchased Credit Suisse's AT1 Notes at artificially inflated prices.  As a series of partial but inadequate disclosures were issued, the price of Credit Suisse's AT1 Notes substantially declined.

265.    At the time of the material misrepresentations alleged herein, Plaintiffs were ignorant of their falsity, and believed them to be true.  Had Plaintiffs known the truth with respect to the business, operations, performance, and prospects of Credit Suisse, which was concealed by Defendants, Plaintiffs would not have purchased Credit Suisse's AT1 Notes, or if they had purchased such securities, they would not have done so at the artificially inflated prices that they paid.

266.    By virtue of the foregoing, Defendants Credit Suisse, Lehmann, and Körner have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

267.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have suffered damages in connection with their transactions in the Company's securities.

268.    Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.

## SECOND CAUSE OF ACTION

### Violations of Section 20(a) of the Exchange Act
### By Plaintiffs Palomino and Azteca Against Defendants Lehmann and Körner

269.     Plaintiffs repeat and reallege each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein.

270.     This cause of action is asserted by Plaintiffs Palomino and Azteca against Defendants Lehmann and Körner and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

271.     Each of Defendants Lehmann and Körner was a controlling person of Credit Suisse within the meaning of Section 20(a) of the Exchange Act.

272.     By virtue of their high-level positions, and their ownership and contractual rights, substantial participation in, and/or awareness of, the Company's operations and/or knowledge or reckless disregard of the materially false and misleading statements disseminated to the investing public, Defendants Lehmann and Körner had the power to influence and control, and did in fact influence and control, directly or indirectly, the decision-making of the Company.

273.     Defendants Lehmann and Körner were provided with or had unlimited access to copies of the Company's statements alleged herein to be materially false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  In particular, Defendants Lehmann and Körner each had direct and supervisory involvement in the day-to-day operations of the Company, and therefore are presumed to have had the power to control or influence the particular false and misleading statements and omissions giving rise to the securities violations alleged herein.

274.     Defendants Lehmann and Körner culpably participated in Credit Suisse's violation of Section 10(b) and Rule 10b-5 with respect to the First Cause of Action.

275.   By reason of the conduct alleged in the First Cause of Action, Credit Suisse is liable for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and Defendants Lehmann and Körner are liable pursuant to Section 20(a) based on their control of Credit Suisse.

276.   Defendants Lehmann and Körner are liable for the aforesaid wrongful conduct, and are liable to Plaintiffs for the substantial damages suffered in connection with their purchases of Credit Suisse AT1 Notes.

277.   Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.

### THIRD CAUSE OF ACTION

**Racketeering in Violation of N.J.S.A. 2C:41-2(c)**
**By All Plaintiffs Against All Defendants**

278.   Plaintiffs repeat and reallege each and every paragraph contained above as if set forth herein.

279.   This cause of action is asserted by all Plaintiffs against Defendants Credit Suisse, Lehmann, and Körner.  Defendants are persons within the meaning of N.J.S.A. 2C:41-1(b).

280.   Defendants comprise an association, associations, and/or associated-in-fact enterprise as defined in N.J.S.A. 2C:41-1(c).  The enterprise has an existence beyond that which is merely necessary to commit predicate acts and, among other things, oversaw and coordinated the commission of numerous predicate acts on an on-going basis in furtherance of the scheme and efforts to conceal the scheme, each of which caused direct injury to Plaintiffs.  The enterprise was operated, managed, and controlled by, among others, Credit Suisse, Lehmann, and Körner.

281.   Defendants willfully conducted and participated in the enterprise's scheme through a pattern of racketeering activity within the meaning of N.J.S.A. 2C:41-1(d).  Defendants' conduct

involved more than two incidents of racketeering conduct, and therefore constituted a pattern of racketeering activity within the meaning of N.J.S.A. 2C:41-1(d).  This pattern consisted of repeated, continuous incidents of racketeering activity that had the same or similar purposes, results, participants, victims, or methods of commission, and are interrelated by distinguishing characteristics rather than isolated incidents within the meaning of N.J.S.A. 2C:41-1(d)(2).

282.   The purpose of the enterprise was to prevent a run on the bank through the dissemination of false and misleading statements concerning Credit Suisse's liquidity position. This extensive scheme was intended to, and did, provide substantial profits to the enterprise's members and caused enormous harm to Plaintiffs.  Defendants operated the enterprise, and achieved these objectives by the conduct of racketeering activity, as described above.

283.   Defendants knowingly and intentionally participated in the conduct of the enterprise, and the entities and enterprises associated with the enterprise, directly and indirectly through a pattern of racketeering activity, including by committing, among others, numerous predicate acts of fraud in the offering, sale, and purchase of securities in violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5, which are incorporated as racketeering activity under of N.J.S.A. 2C:41-1(a)(1)(p).

284.   Each of the predicate acts was for the purpose of executing the enterprise's fraudulent scheme, and Defendants engaged in such acts with the specific intent of furthering that scheme, willfully and with knowledge of its illegal and fraudulent nature.  Defendants performed or participated in the performance of at least two of the predicate acts of securities fraud set forth herein.

285.   The conduct and actions set forth herein were related to each other by virtue of common participants, common victims, common methods, and the common purpose and common

result of a concerted campaign of misinformation concerning Credit Suisse's liquidity situation to prevent a bank run and to enrich the members of the enterprise to the harm and detriment of Plaintiffs, among others.  Defendants' activities were interrelated, not isolated, and involved a calculated series of repeated violations of the law in order to conduct, conceal, and promote fraudulent activity.  The enterprise existed with the members identified herein and others yet unknown since at least October 2022, and the conduct and activities continued through at least March 2023.

286.    Defendants' willful and knowing direct and indirect participation in the enterprise's affairs through the pattern of racketeering and activity described herein constitutes a violation of N.J.S.A. 2C:41-2(c).

287.    These violations of N.J.S.A. 2C:41-2(c) caused Plaintiffs to suffer direct injury to their business and property through massive losses in investment opportunities and gains, and fees and expenses, caused by the enterprise's wrongful actions described herein.

288.    Plaintiffs, therefore, are entitled to recover from Defendants the amount in which they have been damaged, to be trebled in accordance with N.J.S.A. 2C:41-4(c), together with interest and the costs of this suit, including reasonable attorneys' fees.

## FOURTH CAUSE OF ACTION

### Racketeering in Violation of N.J.S.A. 2C:41-2(d)
### By All Plaintiffs Against All Defendants

289.    Plaintiffs repeat and reallege each and every paragraph contained above as if set forth herein.

290.    This cause of action is asserted by all Plaintiffs against Defendants Credit Suisse, Lehmann, and Körner.  Defendants are persons within the meaning of N.J.S.A. 2C:41-1(b).

291.    Beginning as early as October 2022, Defendants and all members of the enterprise agreed to facilitate the scheme described herein to manage, operate, conduct, and participate in the conduct of the affairs of the enterprise and conspired to do the same within the meaning of N.J.S.A. 2C:5-2 through a pattern of racketeering activity within the meaning of N.J.S.A 2C:41-2(d).

292.    Each of the Defendants and enterprise members being persons intimately involved in the transactions carried on by and the affairs of the enterprise – which was engaged in, and the activities of which affected, trade and commerce – unlawfully and willfully conspired, confederated, and agreed with each other to violate N.J.S.A. 2C:41-2(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise, through a pattern of racketeering activity, all in violation of N.J.S.A. 2C:41- 2(d).

293.    As part of the conspiracy, Defendants personally committed or agreed to commit two or more fraudulent and illegal racketeering acts and conducted and agreed to conduct the affairs of the enterprise through the pattern of racketeering in violation of N.J.S.A. 2C:41-2(c) described above.

294.    These violations of N.J.S.A. 2C:41-2(c) caused Plaintiffs to suffer direct injury to their business and property through massive losses in investment opportunities and gains, and fees and expenses, caused by the enterprise's wrongful actions described herein.

295.    Plaintiffs, therefore, are entitled to recover from Defendants the amount in which they have been damaged, to be trebled in accordance with N.J.S.A 2C:41-4(c), together with interest and the costs of this suit, including reasonable attorneys' fees.

## FIFTH CAUSE OF ACTION

**Aiding and Abetting Racketeering in Violation of N.J.S.A. 2C:41-2(c) and (d)
By All Plaintiffs Against Defendants Lehmann and Körner**

296.    Plaintiffs repeat and reallege each and every paragraph contained above as if set forth herein.

297.    This cause of action is asserted by all Plaintiffs against Defendants Lehmann and Körner.  Defendants Lehmann and Körner are persons within the meaning of N.J.S.A. 2C:41-1(b).

298.    Defendants Lehmann and Körner aided and abetted the enterprise in executing its fraudulent scheme and racketeering acts in violation of N.J.S.A. 2C:41-2(c) and (d) alleged herein. Defendants Lehmann and Körner pursued a common plan and design, and actively participated in, aided, and encouraged the other enterprise members in executing a pattern of racketeering activity as defined in N.J.S.A. 2C:41-1 and in violation numerous provisions of New Jersey RICO as alleged herein.

299.    Defendants willingly, and substantially participated in the enterprise's fraudulent scheme with knowledge of the numerous violations of New Jersey RICO and the underlying pattern of racketeering activity perpetrated by the enterprise.

300.    Plaintiffs were injured as a direct and proximate result of Defendants Lehmann's and Körner's aiding and abetting the enterprise's violations of New Jersey RICO alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request relief and judgment, as follows:

(a)    Awarding compensatory damages against Defendants for all damages sustained as a result of Defendants' wrongdoing – including treble damages under New Jersey RICO – in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

(c)    Awarding Plaintiffs their reasonable costs and expenses incurred in this action; and

(d)     Such other and further relief as the Court may deem just and proper.

### **JURY DEMAND**

The Plaintiffs hereby demand a trial by jury as to all issues so triable.


Dated: April 23, 2024

By:     s/ Lawrence M. Rolnick
      Lawrence M. Rolnick
      Marc B. Kramer
      Michael J. Hampson
      Richard A. Bodnar
      **ROLNICK KRAMER SADIGHI LLP**
      1251 Avenue of the Americas
      New York, NY  10020
      Tel. 212.597.2800
      lrolnick@rksllp.com
      mkramer@rksllp.com
      mhampson@rksllp.com
      rbodnar@rksllp.com

      *Counsel for Plaintiffs*

## <u>CERTIFICATION PURSUANT TO L. CIV. R. 11.2</u>

I certify that, to the best of my knowledge, the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

I certify under penalty of perjury that the forgoing is true and correct. Executed on this 23rd day of April 2024.

**ROLNICK KRAMER SADIGHI LLP**

By:  s/ Lawrence M. Rolnick
       Lawrence M. Rolnick